# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### September 23, 2025 Session

## STATE OF TENNESSEE v. CHARLES EDWARD BLANKENSHIP

**Appeal from the Criminal Court for Monroe County**
**No. 22-109  Andrew M. Freiberg, Judge**

_____

### No. E2024-00942-CCA-R3-CD

_____


Defendant, Charles Blankenship, was convicted by a Monroe County jury of possession of 300 grams or more of methamphetamine with the intent to sell or deliver and possession of a firearm after having been convicted of a violent felony. He received an effective sentence of fifty-two years' incarceration. Defendant appeals, arguing that 1) he was denied his right to an impartial jury; 2) the trial court erred in denying his motion to suppress his statement; 3) the evidence was insufficient to support his conviction for possession of methamphetamine; 4) the trial court erred in revoking his bond during the trial; and 5) the trial court abused its discretion in ordering his sentences to be served consecutively. Upon review of the entire record, the briefs and oral argument of the parties, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which J. ROSS DYER and MATTHEW J. WILSON, JJ., joined.

Robert W. White, Sr., Maryville, Tennessee (on appeal); Tammy Crayne, Assistant Public Defender, Madisonville, Tennessee (on motion for new trial); Robert L. Jolley, Jr., Knoxville, Tennessee (at trial and sentencing) for the appellant, Charles Edward Blankenship.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Stephen D. Crump, District Attorney General; and Matthew L. Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

This case arose when deputies of the Monroe County Sheriff's Office ("MCSO"), along with officers of the Vonore Police Department ("VPD"), the Madisonville Police Department ("MPD"), and the Tennessee Highway Patrol ("THP") executed a search warrant at Defendant's property. When the officers arrived, they saw Defendant's adult son running from a barn to a wooded area behind the main residence with a gun; he was quickly apprehended. Two loaded weapons and a large quantity of methamphetamine were recovered during the search of Defendant's property. Defendant was arrested and gave a statement during the search claiming ownership of the guns and the methamphetamine.

Defendant was charged with possession with the intent to sell or deliver 300 grams or more of methamphetamine (count one), possession of a firearm during the commission of a dangerous felony (count two), and possession of a weapon by a felon previously convicted of a violent felony, burglary (count three).

Pretrial, Defendant filed a motion to suppress his statement.[1] Defendant conceded that he had been properly advised of his rights, but relying on *State v. Phillips*, 30 S.W. 3d 372 (Tenn. 2000), alleged that he was coerced into a confession so that his adult son could avoid prosecution. Defendant also claimed that the audio recording of his interview produced by the State in discovery did "not accurately reflect any promises made by the [S]tate about [Defendant]'s son." Defendant alleged that, prior to the recorded interview, law enforcement implied that his son could avoid arrest if Defendant provided a statement and that but for the officer's threat of prosecution against his son, Defendant would not have confessed.

The State disputed Defendant's claims about the recording, asserting that the interviewing officers took "great pains" to inform him that no promises could be made in exchange for his statement.

*Suppression Hearing*

Defendant confirmed that MCSO Detective Dalton Rinehart arrested him following the November 1, 2019 search of his property. He testified that, before speaking with Detective Rinehart, he talked to "a man with an FBI badge," whose name he could not

---

[1] Defendant also filed a motion to suppress the firearms and the methamphetamine found during the search. However, he does not challenge the denial of that suppression motion on appeal.

recall. He could not identify the man because they met only for thirty-minutes four years earlier.

Defendant testified that the FBI agent was present for both the search and the interview and "coerced all of this stuff." He said the agent told him to "tell on the Aryan Brotherhood," even though Defendant denied any involvement. After officers found a bag of methamphetamine and firearms, they arrested and handcuffed Defendant's son who was developmentally delayed. Defendant testified that he pleaded with the agent not to arrest his son "for something [his son] didn't do." The agent then threatened that if Defendant did not cooperate and admit to drug possession, firearm offenses, and fighting chickens, his son would be charged and placed in a cell with African American inmates who would assault him once his Aryan Brotherhood ties became known. Fearing for his son's safety, Defendant told the agent that he would admit to "whatever" to secure his son's release. He maintained that, but for the agent's threats against his son, he would not have provided a statement. After he gave his statement, his son was released from custody.

THP Sergeant Brian Martin testified that in November 2019, he was assigned to the Federal Bureau of Investigation ("FBI") Joint Terrorism Task Force. As a task force officer, Sergeant Martin investigated domestic terrorism groups such as outlaw motorcycle gangs and white supremacist organizations, with a particular emphasis on the Aryan Brotherhood.

Sergeant Martin testified that Detective Rinehart was executing a state warrant, not a federal warrant. Federal authorities were investigating Defendant's ties with white supremacy groups. When Sergeant Martin was alerted that a search would be conducted on Defendant's property, he asked to be present given Defendant's alleged involvement in the Aryan Brotherhood. Sergeant Martin testified that he was unaware of any federal agent at the scene. He acknowledged that "one of the other guys may have been" from a federal agency, but he "couldn't attest to that." He estimated that ten to fifteen officers were at the scene. Although he was present when the search warrant was executed, he did not assist in collecting evidence.

Sergeant Martin testified that Defendant was interviewed in a shed located at the end of a driveway to the right of the main residence on the property. Shortly after he arrived with the entry team, Sergeant Martin observed Defendant's son being brought out of a wooded area in handcuffs accompanied by three officers. He estimated that the treeline was "more like a hundred yards" from the shed.

The audio recording of Defendant's interview was then discussed. The State asked if the trial court had listened to the recording and whether it was still in the court file. The trial court indicated he had the recording in his briefcase, located it, and described it as

"Exhibit One entered August 16, 2022" at a prior hearing. The State played the beginning of the recording in order for Sergeant Martin to identify it. The transcript reflects "audio played" but is unclear how much of it was played. After Sergeant Martin identified the recording, the State asked that it be moved into evidence. The trial court responded, "Well, I think it was by agreement last time, but he did identify Exhibit One." It is unclear if the audio recording was actually admitted in the suppression hearing; however, it is not in the record on appeal as an exhibit to the hearing. During closing arguments, the State said, "Your Honor, I think some of this argument is a little premature seeing as we haven't heard the video yet, but I think the testimony from Sergeant Martin is clear regarding how this interview pr[o]ceded . . . ." The State also referred to facts the trial court would hear when it listened to the recording.

After Sergeant Martin identified the recording, he testified that he did not have any conversation with Defendant outside of what was recorded. He specifically denied threatening to jail Defendant's son or promising leniency for Defendant's son in exchange for information about the Aryan Brotherhood.

On cross-examination, Sergeant Martin testified that he was dressed in plain clothes, which was his customary attire as a task force officer and that "more than likely," he was also wearing a bulletproof vest bearing the FBI insignia. Sergeant Martin explained that task force officers were not issued FBI badges but instead carried credentials. He was not equipped with a body microphone because neither the FBI nor the THP provided one at that time. The interview was recorded using Detective Rinehart's body microphone.

When asked whether he and Defendant talked about Defendant's son going to jail, Sergeant Martin replied that the "problem" was that the methamphetamine found on the property belonged to someone and "somebody's got to go to jail for that." He could not answer whether Defendant's son would have gone to jail for the contraband had Defendant not confessed. Sergeant Martin testified that his focus during the interview was whether Defendant would waive his rights and talk to him about the Aryan Brotherhood.

Sergeant Martin testified that his presence at Defendant's property was unrelated to the state charges; he was there to interview Defendant concerning the Aryan Brotherhood and other white supremacist groups. Sergeant Martin denied that he interviewed Defendant alone and denied speaking privately with him about the Aryan Brotherhood. He maintained that "everything that is on that recording is all that I spoke to him that day." He denied offering to make the charges "go away" if Defendant provided information about the Aryan Brotherhood. Because Defendant denied any association with the group, Sergeant Martin did not pursue the topic further. He did, however, ask about whether Defendant was planning to act as a purchaser of real property on behalf of the Aryan

- 4 -

Brotherhood. Defendant acknowledged awareness of the group's interest but said he refused to be involved because of the purchase price of the property.

Detective Dalton Rinehart testified that he was present during Defendant's recorded interview with Sergeant Martin. He acknowledged that, before entering the shed to participate in the interview, he and other officers were engaged in clearing a large trailer. Detective Rinehart conceded that Sergeant Martin would have had an opportunity to speak with the Defendant outside of his presence at that time.

Detective Rinehart testified that he had listened to the recording "recently" and clarified that he briefly stepped away "a few minutes" upon discovery of the bag of methamphetamine. He confirmed, however, that he was present when the Defendant was questioned regarding the Aryan Brotherhood.

Detective Rinehart denied telling Defendant that his son would not be charged if Defendant confessed or provided incriminating information. Defendant's son was detained and handcuffed throughout the search but was ultimately released and was not charged.

The trial court entered a written order indicating it had listened to the audio recording and denied Defendant's motion to suppress his statement finding that Defendant's statement was voluntary and met the modified trustworthy standard for corroboration. The trial court found Defendant's testimony that he had been threatened by federal agents regarding his son not to be credible. The testimonies of Sergeant Martin and Detective Rinehart were "more credible" than Defendant's and consistent with the recording of the interview. The trial court's order summarized the audio recording of the interview and referred to it as Exhibit One. Again, however, there is no exhibit in the appellate record.

*Voir Dire*

The voir dire summary is limited to facts relevant to Defendant's claim that juror N.H. failed to disclose that his father was, at the time of trial, a captain with MCSO and supervisor of detectives. The transcript shows that N.H. served as juror number six ("Juror 6"). Juror 6 was not among the initially summoned panel seated in the juror box.

After administering the oath to the venire, the trial court began with general questions asking whether anyone "feel[s] they may be related by blood or by marriage to any of the individuals involved in this case." The court named the attorneys, the State's chief witness Detective Rinehart, and sixteen potential witnesses, including the six who later testified at trial. Two prospective jurors explained their connections. Based on their responses, one remained on the jury, and one was excused for cause.

The trial court then asked if any prospective jurors had "relationships with any of the individuals involved in the case." The trial court defined relationship "broadly" giving examples such as neighbor, former neighbor, former schoolmate, former church member, social acquaintance, or former friend. Four prospective jurors responded, and following their responses, one was excused for cause and three remained on the panel. Another juror later disclosed that Sergeant Martin was the half-brother of his son-in-law. The court excused that juror for cause.

The court next asked other questions related to personal knowledge about the case, financial hardships from serving on a two-day trial, and whether personal experience or opinion would affect a juror's ability to be fair and impartial. In response, the court excused eleven jurors for cause.

Following a recess, the trial court turned its attention to law enforcement:

How many are aware that, by a show of hands, that law enforcement, how they are funded, and their conduct can generate strong opinions in our society? Oh, there we go, I see quite a lot.

Ladies and Gentlemen, you just had one individual excused before the break. I have had jurors who raise their hand in other counties and said, Judge, as much as I'd try to be fair, my husband's a cop, my daddy was a cop, my granddaddy was a cop, my two uncles are cops, and my two sons want to grow up to be cops. There can be military families, there can be law enforcement families. Sometimes things like that can affect one's ability to be fair and impartial.

Also have jurors who, under oath, said Judge, I just have a real problem based upon what I experienced about law enforcement, how they conduct things, how they act on roadways, interacting with citizens. Anyone, by a show of hands, have a personal opinion or life experiences, strongly held beliefs about law enforcement, that could impact their ability to be fair and impartial in this case? I see no hands having been raised.

The State and defense counsel then proceeded to voir dire the panel. Defense counsel asked the following question about law enforcement:

Any of y'all have any dealings with other law enforcement officers, not any of the ones that have been listed, because we have people listed from four different agencies. Anybody deal with any of the other agencies, or maybe

outside you heard [another prospective juror] talk about working in Florida for law enforcement.

A retired police officer raised his hand, and upon further questioning, agreed that officers should be held to a higher standard because they investigate people. When counsel asked whether anyone disagreed, there was no audible response. The retired officer remained on the panel.

Juror 6 was seated in the jury box after the fourth round of challenges. Before each round, the trial court asked whether any prospective juror had "any comment, answer, or response to any of the questions that have been asked of you, or the subject matters we've discussed" or whether they were concerned about being fair and impartial. The trial court noted that no one had raised their hands until the third round when a prospective juror stated that she may not be able to "deal" with a drug case because her son had been assaulted by a person involved with illegal drugs. She was excused for cause and Juror 6 was called to replace her in the jury box.

The first time Juror 6 spoke during voir dire was when the prosecutor asked whether he had any responses to the questions already posed; he answered that he did not and stated he had no issues serving on the jury. Jury selection continued through four additional rounds, during which four more prospective jurors were excused. The jury was then empaneled in the ninth and final round.

When trial resumed the following day, the trial court informed the parties it had been informed that Juror 6 was the son of a long-time Madisonville Officer who had recently been hired by the MCSO as captain of the detectives. The trial court had known Juror 6's father "beyond professional capacity for about two decades[.]" The trial court recalled that Juror 6 "looked familiar" and "almost mentioned it" when Juror 6 was seated. The trial court did not initially view Juror 6's presence on the jury to be "a problem" and recalled from the voir dire: "[H]e was asked a number of times, can you be fair, do you have a concern about your fairness, and he's a young man." The court noted that Juror 6's father had previously been a school resource officer.

Defense counsel insisted that "all of the potential jurors were asked about any relationship they might have to law enforcement, and [Juror 6] did not say a word." The trial court disagreed, stating that the jurors were asked whether the topic of law enforcement generated "strong opinions" and whether those opinions "would impact your ability to be fair and impartial." Defense counsel maintained that it was his "standard" practice to ask whether jurors knew anyone in the District Attorney General's Office and then ask the same question about law enforcement. The State disagreed, adding that Juror 6's father was not employed by the MCSO at the time of the search and had only recently

joined the MCSO. Detective Rinehart, present in the courtroom but not under oath, confirmed that Juror 6's father was at that time his captain and stated he had never met Juror 6.

The trial court advised the parties that the court reporter had reviewed the entire voir dire transcript and confirmed that neither the court nor counsel had directly asked whether any juror "knew anyone in law enforcement." The trial court found no prejudice in seating Juror 6 because he was never asked a question specifically designed to elicit that information:

> The questions that were asked related to do you have strong feelings about law enforcement[?] Do you know any of these parties involved you have any relationships with the parties involved with this case[?] [Juror 6] is not involved in this case. Would you hold law enforcement to a higher standard or would you elevate law enforcement testimony to the exclusion of other individuals[?] So, you know, just be thinking about that. But the specific question was never asked of . . . [Juror 6]. So, I do not find at present that he has in any way omitted truth, or lied. He was never asked. So, we're going to continue, having said that, we do have an alternate and if the parties at a future break wanted to re-raise the issue we can. But the Jurors were never asked if they just simply know anyone in law enforcement.

Later that same day, when the trial took a break to accommodate Defendant's insulin needs, the trial court asked the jury whether a continuance would cause any personal or financial hardship. One juror, a teacher, explained that state testing was soon approaching, that she did not have a substitute for the missed day, and that another teacher was already covering her class. During a conference outside the jury's presence, defense counsel expressed concern about striking the teacher:

> Your Honor, my only concern is that striking her and then [Juror 6] and that's something that we're going to have to address later on. But it's certainly in the Court's discretion if that's one of the reasons why teachers at one time teachers were exempt from service. (sic).

The State said that it would defer to the trial court but asked whether "a substitute could be procured" before the teacher was outright dismissed. The trial court ultimately excused the teacher for cause and seated the alternate as the final juror.

*Trial*

Detective Rinehart's trial testimony was broader in scope than the testimony he gave at the suppression hearing. He testified that on November 1, 2019, he executed a search warrant on a rural property as the lead detective on the case. The property consisted of a long driveway with a wooden privacy fence at the front, leading to a house, a trailer, and a barn. Surrounding the trailer and barn were "hundreds of chicken coops" which were described as blue barrels, and the rear of the property bordered a wooded area.

As the entry team arrived, Detective Rinehart observed a man, later determined to be Defendant's son, running from the barn, cutting across the chicken coops, and heading toward the woods while carrying a firearm. Detective Rinehart secured the trailer, which served as the main residence, while another officer pursued the son into the wooded area. A separate team secured the barn. During this process, he observed Defendant, another adult male, and several children exiting the barn, at which point Defendant was placed under arrest.

Detective Rinehart was then directed to Officer Jim Wall, who had apprehended Defendant's son at the treeline of the property. Officer Wall pointed out a Glock handgun and a shotgun lying on the ground. Nearby, a blue chicken barrel had been tipped over, and at its base was a large bag containing a crystalline substance. The substance was packaged in a clear zipper bag inside a large white plastic grocery bag. After securing the firearms and the bag, Detective Rinehart interviewed both Defendant and Defendant's son.

Defendant was interviewed in the barn with Sergeant Martin present. Inside one of the rooms in the barn, Detective Rinehart observed a box of plastic baggies, which he testified are commonly used to package and distribute controlled substances. He noted that the barn contained no kitchen or food preparation area, though he did observe "a few cans of loose food." On top of a toolbox in the room was a box of 9mm ammunition, consistent with the caliber of one of the firearms recovered outside.

During Detective Rinehart's testimony, an audio recording of Defendant's interview was entered as Exhibit 7 and played for the jury.[2] In the recording played for the jury,

---

[2] The exhibit does not include discussions about Defendant's involvement with the Aryan Brotherhood. In its order denying the motion to suppress, the trial court made specific findings that Defendant had been asked about the Aryan Brotherhood, that Defendant denied any affiliation, and that line of questioning had been "quickly abandoned." Thus, Exhibit 7 appears to have been redacted to exclude the topic of Defendant's affiliation with the group.

- 9 -

Sergeant Martin informed Defendant of his *Miranda*[3] rights, identified himself as an FBI Task Force Officer, and showed his credentials. Defendant acknowledged he understood his rights and immediately stated, "Let's make this go away," a phrase he repeated throughout the interview. Sergeant Martin emphasized that he could not make promises or guarantee a specific outcome because charging decisions rested with other authorities, but he said he would relay Defendant's cooperation to the proper authorities.

Defendant admitted that the "half-pound of dope" found on the property was his and denied his son's involvement. He said he told his son to move the guns. He also admitted he had hidden the methamphetamine about an hour before officers arrived, that he "kep[t] moving" the drugs, and that he would hide drugs "everywhere," including under leaves or stumps. He said the Guzman Cartel supplied the drugs and delivered them every two to three weeks by three or four runners who usually drove out-of-state vehicles. He stated that he simply called the cartel when he wanted a fresh supply which usually involved "at least a brick" or one kilogram of methamphetamine. As far as he was aware, the drugs came from Mexico. In terms of his sales practices, Defendant stated that he had recently shifted from quarter-pound transactions to one-ounce transactions for $300-$400. He measured the drugs by "eyeballing." He admitted selling to one or two people in the days before the search and initially refused to identify his primary buyer but later identified a buyer who lived in Knoxville. He said that he sold drugs because he could not afford to raise six children and pay for insurance. He revealed that he was diabetic and took fifty units of insulin daily. Sergeant Martin asked how Defendant was feeling, and Defendant responded that his "sugar was high."

Defendant said he understood that neither Sergeant Martin nor Detective Rinehart could promise him a certain outcome. He was concerned about the cartel finding out about the raid, and said, "I'm trying to fix this. I know you say [you] can't make no promises. But you'll have to move me." He suggested he would have to go into hiding or witness protection.

Toward the end of the recording, Sergeant Martin said, "The only other issue is that your son claimed possession of [the] drugs." Defendant reiterated that the drugs were his and that his son was "just trying to get me out of trouble." Sergeant Martin then told Defendant, "This is the way it's going to go." However, the recording then became inaudible and ended with Sergeant Martin telling Defendant that the "jail has insulin."

After the recording was played, Detective Rinehart explained terminology used, including that "kilo" or "k" refers to kilograms, a standard unit of measurement for resale

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (holding any statement made by the accused during a custodial interrogation without the benefit of procedural safeguards is inadmissible in court)

quantities of drugs, with one kilogram equaling 2.2 pounds. He explained further that "bricks" or "birds" are slang terms for such quantities. Detective Rinehart testified that Defendant's price of $300-$400 per ounce of methamphetamine was "on the cheap end," as he had observed other dealers selling for $450-$500 per ounce. No scales or measuring devices were recovered from the property, consistent with Defendant's statement that he simply "eyeball[ed]" the amounts.

Detective Rinehart recalled that Sergeant Martin briefly spoke with Defendant alone when he stepped away to confer with other officers. He heard Defendant state that his son had nothing to do with the firearms or the drugs. Defendant was not shown the bag of methamphetamine but was informed of its discovery. The bag was later weighed at the sheriff's office. Detective Rinehart confirmed that the Defendant's son was not charged nor was he transported to the county jail.

On cross-examination, Detective Rinehart estimated that the shotgun was located approximately 100 to 150 yards from the barn and five to ten feet from the handgun. Both firearms were five to ten feet from the barrel containing the bag of methamphetamine. He did not observe Defendant in possession of either the handgun or the shotgun. Detective Rinehart observed "hundreds" of fifty-five-gallon chicken barrels on the property. The barrels near the chicken coops were in use, but the barrel containing the methamphetamine was not in use and was "between five or ten steps" from the treeline. Because he was not the officer who first located the drugs, he could not confirm whether the bag was inside the barrel when it was discovered. He stated that officers searched the property extensively, but no additional drugs were found. Neither the barrel nor the white plastic bag was dusted for fingerprints.

Detective James Wall, a MCSO narcotics investigator, arrived with the entry team to execute the search warrant at Defendant's property. Upon exiting his vehicle, Detective Wall observed a man, later identified as Defendant's son, leaving the barn and moving toward the wooded area. The man initially walked but then began to run, carrying what appeared to be "a long black object." Detective Wall pursued him into the woods. Approximately fifty yards in, the man dropped the object and surrendered by raising his hands. Detective Wall observed a black rifle within two to three feet of a blue barrel. He called for other officers to detain Defendant's son and then returned to the barrel. He identified the firearm as a shotgun, and a pistol was located next to it. Detective Wall unloaded both weapons to prevent accidental discharge. He then overturned the barrel to check for additional weapons and discovered a zippered bag containing what he described as "[a] large amount" of methamphetamine. Based on his experience as a narcotics investigator, Detective Wall testified that the quantity was "not consistent with personal use." He immediately notified Detective Rinehart and the evidence custodian, Angelina Kelly, to recover and secure the contraband.

Detective Wall searched other barrels as well as the wooded area. No additional firearms or narcotics were found. He did not interview or take statements from any individuals present at the scene.

On cross-examination, Detective Wall testified that he did not question Defendant's son and had minimal interaction with him after his apprehension. Detective Wall acknowledged that he did not observe Defendant in possession of either the firearms or the methamphetamine.

Special Agent Jessica Sosa, a forensic scientist with the Tennessee Bureau of Investigation's forensic chemistry unit, analyzed the crystalline substance recovered from the blue barrel. The substance tested positive for methamphetamine and weighed 302.70 grams. Special Agent Sosa described the quantity as "significant." The testing was conducted approximately five and one-half months after receipt of the evidence due to a backlog within the forensic chemistry unit.

At the close of the State's proof, the trial court granted the Defendant's motion for judgment of acquittal on count two of the indictment, possession of a firearm during the commission of a dangerous felony. *See* Tenn. R. Crim. P. 29(b).

Defendant's mother, Rhedda Kiser, testified that she owned the Monroe County property searched on November 1, 2019, and confirmed that Defendant and his family lived there at the time. Ms. Kiser received a phone call informing her that her property was being searched. When she arrived, she observed Defendant and his son in handcuffs and saw Defendant speaking with an individual she "assume[d]" was a law enforcement officer.

Defendant testified that he resided on his mother's property with his wife and four children, including his eldest son, who was twenty-two years old and who had been handcuffed during the search. Defendant stated that he was asked to examine the bag containing the crystalline substance recovered during the search but denied ever having seen the bag before. He was told his son would be charged with possession of the substance and the firearms. Defendant denied placing the bag in the woods and asserted that "no way none of my fingerprints is ever on [the bag]."

Defendant testified that, at the time officers arrived to execute the search warrant, he and his children were "out in the building" eating ice cream. He recalled that the officers entered "hollering with guns and stuff," and he attempted to calm his children. According to Defendant, an individual he described as "the FBI man" entered, displayed a badge, and briefly conversed with him before escorting him outside, where he was shown his son in handcuffs. Defendant testified that the FBI agent told him his son would be charged with possession of methamphetamine for resale and sent to jail, where he would be "gang

raped," unless Defendant confessed that the drugs were his. Defendant testified that he protested, asking why his son would be charged when the bag was found "250 yards from us."

Defendant insisted that this conversation occurred prior to his recorded statement. He testified that he was urged to give a "convincing" confession but maintained that he "didn't have a clue" about illegal drug trafficking. He noted that the selling price he gave during the interview was considered "low" by one of the interviewing officers and rhetorically asked, "Do I look like I know Juan Guzman or El Chapo, really?"

Defendant explained that his son had attended learning disability classes in school but had earned sufficient credits to graduate from high school. Defendant confirmed that his son had never been arrested in this case.

On cross-examination, Defendant acknowledged that he had lived on his mother's property for approximately sixteen years. He reiterated that he gave a statement only after the FBI agent threatened to arrest his son. He did not recall stating that he had moved the bag of methamphetamine an hour before the officers' arrival. He maintained that he did not know where the bag was found and testified that he saw it for the first time at trial.

Defendant testified further that he fabricated details in his recorded interview to protect his son from arrest. Specifically, he admitted inventing claims about knowing members of a drug cartel, about individuals with out-of-state licenses from Texas and Georgia delivering drugs to his driveway, and about the price he allegedly paid for a kilogram of methamphetamine.

On rebuttal, the State called Sergeant Martin who testified consistently with his testimony at the suppression hearing; however, he did not mention his investigation of the Aryan Brotherhood or Defendant's ties to the white supremacy group. He testified that he was involved in the execution of the search warrant by the MCSO on November 1, 2019. As a member of the FBI's Joint Terrorism Task Force and Violent Crimes Task Force, he was the only officer affiliated with the FBI at the scene. He informed the jury that he interviewed Defendant with Detective Rinehart. He had listened to the recording of the interview and confirmed that it was taken according to the practice and procedure for law enforcement interviews. Sergeant Martin testified that the interview was held in a shed located to the right of the driveway. He described the tone of Defendant's interview as "cordial" and explained that the goal of law enforcement in conducting an interview is to alleviate as much of the "nervousness" as possible.

Sergeant Martin denied that he threatened Defendant at any time or had a conversation with Defendant that was not recorded. He denied having a discussion with

Defendant about his son or what would happen to his son and specifically denied telling Defendant that his son would be gang raped in prison.

On cross-examination, Sergeant Martin denied that it was "part of the FBI rules not to record all conversations with Defendants[.]" He had not been furnished a body camera by the FBI or the THP. He testified that he left Detective Rinehart after his questioning of Defendant "was pretty much over as far as I was concerned." He then assisted in the search of the residence during which no additional contraband was found. Sergeant Martin did not have any contact with Defendant's son.

Defendant recalled Ms. Kiser to make a proffer out of the jury's presence. Ms. Kiser testified that Defendant asked a man she did not know "why [his] boy [was] in handcuffs," and the man replied, "he's not a boy, he's a man." Ms. Kiser testified that she heard Defendant say, "I'll say it's mine." Ms. Kiser testified that she did not know the man, nor did she know what Defendant agreed to claim was his.

Based on this proof, the jury convicted Defendant of the remaining two counts as charged in the indictment.

*Bond Revocation*

The trial transcript shows that on the second day of trial during Detective Wall's cross-examination, Defendant alerted the court that he had not taken his insulin and that his "sugar's real high." Defendant had "accidentally left [his] insulin" with a friend who had given him a ride to the courthouse. He asked for "the people at the jail" to check his numbers and give him insulin; otherwise, he predicted that he would be "cramping up real bad" in about an hour. The trial court instructed a court officer to locate a nurse from the jail to check Defendant's sugar level and administer insulin. After being advised that the jail could not administer insulin, a nurse came to court, and the trial court asked "hypothetically," if Defendant's bond were revoked if he could then receive treatment. Under oath, the jail nurse testified that Defendant could be treated "if he's in custody."

The court then read into the record an order revoking Defendant's bond pursuant to Tennessee Code Annotated section 40-11-141(b). The order recited that the court had afforded Defendant deference and regular breaks to monitor his insulin throughout the trial, that Defendant had delayed jury selection by his absence on one occasion, and that although Defendant had been supplied with food and allowed to eat, he had failed to bring his insulin to court. The order found that Defendant's actions "obstruct[ed] the orderly and expeditious progress" of the case and disrupted the trial, and revoked Defendant's bond. The court advised Defendant of his right to a full bond-revocation hearing which was set

for February 17, 2023, and instructed the Monroe County Jail to treat Defendant medically and return him in street clothes for trial to continue at 1:00 p.m. that day.

Defense counsel asked whether the trial court would reconsider once Defendant obtained his insulin. The court stated its "hope and goal" that Defendant receive the insulin and assured counsel it would revisit the matter after treatment. To avoid jury confusion, the court asked whether either party objected to informing the jury that court was in recess; neither side objected. The court then took a ninety-minute recess to accommodate Defendant's medical needs.

After treatment, defense counsel remained concerned that Defendant's diabetic condition had not sufficiently improved and expressed concern that Defendant's condition could impair his decision whether to testify. The jail nurse testified that she had checked Defendant's sugar and administered insulin at 11:00 a.m. Because the insulin given was not rapid-acting, she explained that she would need to recheck Defendant's sugar levels at 3:00 p.m. She stated that Defendant regularly received thirty units daily, which she described as "a good amount." She testified that she had no reason to question Defendant's competency; he "was able to answer all the questions correctly."

Defense counsel informed the court that Defendant understood that if the trial continued to the next day he would "spend the night in jail" and then moved for a continuance until the next morning. The next morning, counsel reported that Defendant had improved but raised complaints about the jail's administration of his medication. The trial court received updated vitals indicating readings "well within a functioning, normal, range," and stated that any future issues later in the day would be addressed if they occurred. Defense counsel confirmed that Defendant's wife and mother had brought his insulin to the jail the previous night. The trial court stated it had no objection to releasing Defendant back on bond pending the jury's outcome.

*Sentencing*

The State introduced Defendant's presentence report. Defendant objected to two inaccuracies in the report, clarifying that he was serving a community corrections sentence, not parole, at the time of the instant offenses, and that he had renounced his affiliation with the Brotherhood Forever gang through a formal gang procedure. The presentence report was admitted as corrected without further objection. The State also introduced a copy of the judgment from Defendant's prior burglary conviction, certified copies of judgments of conviction from Blount County, and his 2016 conviction in Loudon County for possession with intent to sell or deliver 0.5 grams or more of methamphetamine, for which he was serving a community corrections sentence at the time of the present offenses.

- 15 -

Defendant submitted a letter of support from Bobby Long of Long's Construction, who verified Defendant's employment and described him as an "outstanding" and "reliable" employee whom Mr. Long would welcome back "as soon as possible." The trial court admitted that letter. The trial court excluded a letter that was unsigned and from an individual whose relationship to Defendant was unknown and on which Defendant's mother wrote that her son suffered from colon cancer, diabetes, and "heart trouble," and requested he be placed in a facility where he could receive treatment; the trial court excluded that letter.

The State then called Detective Rinehart, who testified that a significant portion of his career had been devoted to investigating the sale and manufacture of methamphetamine. He described the destructive impact of methamphetamine on the community, including its addictive nature, the loss of lives to addiction, and the profits dealers derive from exploiting that addiction.

Detective Rinehart testified that the 302.70 grams of methamphetamine recovered in this case was a "significant" amount and that $150 for an "eight-ball" (3.5 grams) of methamphetamine would yield a "pretty hefty profit." Based on his experience, Defendant was not engaged in a "one-off" transaction but in an ongoing drug-selling operation. He expressed concern about the presence of firearms in conjunction with the methamphetamine, testifying that such circumstances "invite violence into the community." He explained that possession of such a large quantity of drugs would likely attract robbery attempts, creating a substantial risk of gun violence. He was concerned that several children were present on the property during the execution of the search warrant and that Defendant's son was seen running with a firearm from the same barn entrance through which Defendant and the children were escorted.

In response to the trial court's inquiry, Detective Rinehart testified that there was no indication Defendant was raising chickens for food. Instead, he observed barrels, spurs, and a ring or pit inside the barn consistent with cockfighting. He testified that the chickens were tethered "like the same way a dog's tied up on a leash," and while there may have been egg-laying hens, he did not observe any.

As relevant to this appeal, the State argued for consecutive sentencing under Tennessee Code Annotated section 40-35-115(b)(1) and (2), citing Defendant's extensive criminal history and reliance on criminal activity as a major source of livelihood. In response to the trial court's question regarding whether *Wilkerson* findings were required for non-*Wilkerson* factors, the State argued that, notwithstanding the dismissal of count two, Defendant's conduct was "inherently dangerous," emphasizing that "guns and drugs

do not mix" and that Defendant's admitted drug trafficking created a substantial danger to the community.[4]

Defense counsel conceded that Defendant qualified as a multiple offender on both convictions but argued that the firearm conviction should be classified as a Class D felony rather than a Class B felony, because burglary was no longer considered a crime of violence.[5]  Defendant requested concurrent sentencing, seeking a total effective sentence of twenty-five years.  Defendant also argued that since the 2019 offenses, he had committed "no other violations of law," and characterized his earlier record as consisting primarily of driving offenses and public intoxication, notwithstanding two felony convictions.

The trial court applied two enhancement factors and no mitigating factors.  It placed "great weight" on the Defendant's criminal history and the fact that he committed the instant offenses while serving a community corrections sentence in Loudon County.  *See* T.C.A. § 40-35-114(1), (13).  The trial court imposed a sentence of forty years for the drug conviction and twelve years for the firearm conviction and ordered the sentences to run consecutively, based on what the trial court described as the "mind-numbing amount of criminality" in Defendant's history.

*Motion for New Trial*

Defendant filed a timely motion for new trial.  In an amended motion for new trial, Defendant added the claim that the trial court erred by allowing Juror 6 to be seated on the jury when it was discovered Juror 6 failed to disclose that his father was an MCSO supervisor of Detectives Rinehart and Wall.

At the motion for new trial hearing, the trial court admitted collective employment records showing Juror 6's father was a full-time MPD officer from August 2008 to April 2020 and served as MCSO chief of detectives from July 4, 2020, to March 31, 2023.[6]  The trial court noted that the offenses occurred on November 1, 2019, and the trial was held in February 2023.

Juror 6 testified that when asked during voir dire whether any member of the venire had a blood relationship to anyone involved in the case, he understood the question to refer

---

[4] *State v. Wilkerson,* 905 S.W.2d 933 (Tenn. 1995) (holding that before imposing consecutive sentences based on the dangerous offender classification, trial courts must conclude that the evidence has established that the aggregate sentence is "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal act).

[5] Defendant does not pursue this claim on appeal.

[6] We note that Defendant raised other issues in his motion for new trial.  However, we have summarized the evidence presented at the hearing only as it relates to Defendant's voir dire issue raised on appeal.

only to persons "relevant to the case." When asked why he did not answer a broader inquiry inviting disclosure of anything in a juror's background or opinion that was "causing difficulty" in serving as a juror on "anything we haven't covered" or "haven't asked you about," Juror 6 testified that he did not feel it necessary to respond. He described a close but infrequent relationship with his father, speaking "once every two or three weeks," and explained that his father also worked long hours running his own business. Juror 6 denied discussing the case with his father, acknowledged he was aware his father held the position of chief of detectives, and stated he neither personally knew nor had he met any of the detectives. He testified that, while he wanted his father to succeed, he and other family members had reservations about his return to field work.

The court reviewed the trial transcript with the court reporter and observed that two alternates were available when it became known that Juror 6's father was an MCSO captain. The trial court found the matter had been "vetted" and "discussed" but that defense counsel never made a contemporaneous objection to strike Juror 6 for cause. The trial court denied the motion for new trial. Defendant filed a timely notice of appeal under Rule 3 of the Tennessee Rules of Appellate Procedure.

**Analysis**

I. Juror Bias

Defendant contends that his right to a fair trial was violated because Juror 6 failed to disclose that his father was employed by MCSO and supervised two of the trial witnesses. The State contends that Defendant is not entitled to relief because he failed to establish a presumption of bias. In his reply brief, Defendant maintains that Juror 6's failure to disclose his familial relations established a presumption of bias that the State has not overcome. We agree with the State.

The right to a jury trial is a foundational right protected by both the federal and state constitutions. *State v. Smith*, 418 S.W.3d 38, 44 (Tenn. 2013); U.S. Const. amend. VI; Tenn. Const. art. I, § 9. This right envisions a trial by an unbiased and impartial jury. *Smith*, 418 S.W.3d at 45 (citing first *Boyd v. State*, 82 Tenn. 161, 168 (1884); and then *State v. Goltz*, 111 S.W.3d 1, 4 (Tenn. Crim. App. 2003)). "An unbiased and impartial jury is one that begins the trial with an impartial frame of mind, that is influenced only by the competent evidence admitted during the trial, and that bases its verdict on that evidence. *Id.* (citing first *Durham v. State*, 188 S.W.2d 555, 558 (1945); and then *State v. Adams*, 405 S.W.3d 641, 650-51 (Tenn. 2013)).

The aim and purpose of voir dire is to select jurors who are competent, unbiased, and impartial. *State v. Hugueley*, 185 S.W.3d 356, 390 (Tenn. 2006); *State v. Akins*, 867

S.W.2d 350, 355 (Tenn. Crim. App. 1993) ("The essential function of voir dire is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel."). Counsel's full knowledge of the facts which might bear upon a juror's qualifications "is essential to the intelligent exercise of peremptory and cause challenges[.]" *Akins*, 867 S.W.2d at 355. Accordingly, "jurors are obligated to make 'full and truthful answers . . . neither falsely stating any fact nor concealing any material matter.'" *Id.* (quoting 47 Am. Jur. 2d, Jury § 208 (1969)).

Challenges to a juror's qualifications fall into two categories: *propter defectum* ("on account of defect") or *propter affectum* ("on account of prejudice"). *Carruthers v. State*, 145 S.W.3d 85, 94 (Tenn. Crim. App. 2003) (citing *Akins*, 867 S.W.2d at 355). *Propter defectum* challenges are "based upon general disqualifications, such as alienage, family relationship, or statutory mandate" and must be raised prior to the return of the verdict. *Id.*; *Akins*, 867 S.W.2d at 355. *Propter affectum* challenges are "based upon the existence of bias, prejudice, or partiality towards one party in the litigation actually shown to exist or presumed to exist from the circumstances" and may be raised after the verdict in a motion for new trial. *Carruthers*, 145 S.W.3d at 94; *Akins*, 867 S.W.2d at 355.

A defendant bears the burden of establishing a prima facie case of bias or partiality. *Akins*, 867 S.W.2d at 355 (citing *State v. Taylor*, 669 S.W.2d 694, 700 (Tenn. Crim. App. 1983)). "When a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality, a presumption of prejudice arises." *Id.* Moreover, "[s]ilence on the juror's part when asked a question reasonably calculated to produce an answer is tantamount to a negative answer." *Id.* Circumstances giving rise to a presumption of bias include a juror's willful concealment of prior involvement as the prosecuting witness in a similar case or a juror's concealment of a close personal or familial relationship with one of the parties involved in the trial. *See Hugueley*, 185 S.W.3d at 378 (citing first *Durham*, 188 S.W.2d at 559; and then *Toombs v. State*, 270 S.W.2d 649, 651 (1954)).

If a defendant has established bias, the State may rebut the presumption with the "absence of actual prejudice" or in some cases, "actual partiality[.]" *Akins*, 867 S.W.2d at 357. Actual prejudice may be demonstrated "by the challenged juror's conduct during jury deliberations which gives rise to the possibility that improper extraneous information was provided to the jury." *Id.* To determine whether the presumption of prejudice is overcome, the trial court "must view the totality of the circumstances, and not merely the juror's self-serving claim of lack of partiality[.]" *Id.*

This court reviews a trial court's factual findings, under a de novo standard, with a presumption of correctness unless the evidence preponderates otherwise. *Adams*, 405 S.W.3d at 656 (citing first Tenn. R. App. P. 13(d); and then *Fields v. State*, 40 S.W.3d 450,

458 (Tenn. 2001)).  The trial court's conclusions of law, "such as whether a jury's verdict was affected by extraneous prejudicial information or an improper outside influence," are reviewed under a de novo standard, with no presumption of correctness.  *Id.* (citing *Fields*, 40 S.W.3d at 458).

In this case, Defendant has failed to establish a prima facie case of bias or partiality from Juror 6's failure to reveal that his father was the MCSO captain of detectives at the time of trial.  The voir dire transcript reflects that prospective jurors were not directly asked whether they were related by blood or marriage to an individual employed in law enforcement.  Instead, defense counsel inquired more generally as to whether any juror had "dealings with other law enforcement officers" or had occasion to "deal with any of the other agencies."  Similarly, the trial court questioned whether jurors held "strong opinions" or "strongly held beliefs" arising from a familial relationship with someone in law enforcement.  The record supports the trial court's finding that the questions posed were not reasonably calculated to elicit disclosure of a juror's familial connection to law enforcement personnel, unless that connection had already shaped the juror's opinions or beliefs.  Juror 6 denied having any dealings or relationships with law enforcement that would influence his perspective.  Additionally, defense counsel's open-ended question about "anything we haven't covered" or "haven't asked you about" would not have naturally prompted a response from Juror 6.

The record demonstrates that Juror 6's father was not involved in the investigation of the offenses, was not a witness in the case, and assumed the position of captain only after the crimes had occurred and Defendant had been charged.  Juror 6 was unfamiliar with the facts of the case, did not know the detectives who testified, and did not discuss the matter with his father.  As this court has held, "Juror bias must be shown, not just suspected."  *State v. Lawson*, 794 S.W.2d 363, 367 (Tenn. Crim. App. 1990) (citing *Smith v. Phillips*, 455 U.S. 209 (1982)).  "Although the relationship of a juror to one of the witnesses may present an opportunity for prejudice, bias will not be presumed and the defendant is not relieved of the burden of presenting facts *in addition to mere relationship* which would give rise to a showing of actual prejudice."  *Hugueley*, 185 S.W.3d at 379 (quoting *Bristow v. State*, 242 Md. 283, 286, 219 A.2d 33, 34 (1966)) (emphasis added).

Nothing in Juror 6's testimony during voir dire or at the hearing on the motion for new trial demonstrated that he harbored bias in favor of the State by virtue of his father's position with MCSO.  Moreover, the record does not show, and Defendant does not assert that he exhausted all his peremptory challenges.  "[T]he failure to correctly exclude a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges *and* an incompetent juror is forced upon him."  *Id.* (quoting *State v. Howell*, 868 S.W.2d 238, 248 (Tenn. 1993)).

Defendant has failed to make a prima facie case of bias, and the record does not show whether he exhausted his peremptory challenges. He is not entitled to relief.

## II. Motion to Suppress

Defendant argues the trial court erred in denying his motion to suppress his statement because it was involuntary and coerced by threats to arrest and imprison his son. The State responds that the claim is waived because the portions of Defendant's recorded interview relevant to this issue and relied upon by the trial court are not in the appellate record. Alternatively, the State contends the preserved record supports the trial court's conclusion that Defendant's statement was voluntary. Defendant replies that the record shows Sergeant Martin made an implied promise that rendered his statement involuntary. We must first determine whether the record is adequate to permit meaningful appellate review.

### A. Waiver – Missing Record

It is the appellant's responsibility to provide this court with a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal[.]" Tenn. R. App. P. 24(a), (b). If an exhibit necessary to resolve an issue is missing from the record, the issue may be deemed waived. *State v. Banes*, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993); *State v. Terry*, No. E2020-01344-CCA-R3-CD, 2021 WL 4929441, at *4 (Tenn. Crim. App. Oct. 22, 2021) (deeming sentencing issue waived where transcript of second sentencing hearing was not in the record and the basis of the trial court's sentencing decision could not be discerned without it). However, if the available record is otherwise adequate for a meaningful review, this court may review the issue but with the presumption that the missing evidence would support the ruling of the court. *State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012); *see also State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991) ("In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence.").

Defendant claims that Sergeant Martin threatened to arrest his son and predicted that his son would encounter violence in jail unless Defendant accepted culpability for the methamphetamine and guns and provided information implicating the Aryan Brotherhood. In his motion to suppress his statement, Defendant asserted that the State provided an incomplete recording of the interview because the recording "did not accurately reflect any promises made by the [S]tate about [Defendant]'s son." The record does not include the recording referenced during the suppression hearing, and the burden is on Defendant as the appellant to ensure its inclusion. *See, e.g.,* Tenn. R. App. P. 24; *Banes*, 874 S.W.2d at 82.

Defendant is not, however, foreclosed from having this issue reviewed. The trial court's order summarizes the recorded interview and does not rely solely on the recorded interview in denying Defendant's suppression motion. Three witnesses testified at the suppression hearing, and the trial court made express credibility findings of their testimonies. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000) (granting trial courts "considerable deference on review" on credibility issues because they are "uniquely positioned to observe the demeanor and conduct of witnesses"). Because the legal basis for the denial of the suppression motion is discernible from the preserved record, we will address the voluntariness claim on the merits. *Cf. Terry*, 2021 WL 4929441, at *4.

## B. Voluntariness of Defendant's Confession

"[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. Green*, 697 S.W.3d 634, 640 (Tenn. 2024) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). "Questions about the 'credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" *Id.* (quoting *Odom*, 928 S.W.2d at 23). Appellate courts may consider evidence offered at both the suppression hearing and the trial when reviewing the trial court's ruling on a suppression motion. *State v. Washington*, – S.W.3d –, 2025 WL 2847585, at *3 (Tenn. Oct. 8, 2025) (citing *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998)). The State, as the prevailing party, is afforded the "strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *State v. McKinney*, 669 S.W.3d 753, 764 (Tenn. 2023) (quoting *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010)). While this court will defer to the trial court's credibility findings, "the application of the law to the facts is a question of law that appellate courts review de novo with no presumption of correctness." *Green*, 697 S.W.3d at 640 (quoting *State v. Bell*, 429 S.W.3d 524, 529 (Tenn. 2014)); *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012).

Confessions that are the product of coercion, be it physical or psychological, are considered involuntary and, therefore, inadmissible. *Rogers v. Richmond*, 365 U.S. 534, 540 (1961). "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996). A voluntary statement must "not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however, slight, nor by the exertion of any improper influence . . . ." *Id.* (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). "A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *Id.* (citing *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)).

"[C]oercive police activity is a necessary predicate to finding that a confession is not voluntary." *Brimmer*, 876 S.W.2d at 79 (citing *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)). "[T]he essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion." *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (citing first *Dickerson v. United States*, 530 U.S. 428, 433-35 (2000); and then *Smith*, 933 S.W.2d at 455). The question of whether a suspect's will was overborne "must be answered with 'complete disregard' of whether or not the accused was truthful in the statement." *Phillips*, 30 S.W.3d at 377 (quoting *Rogers*, 365 U.S. at 544). To determine the voluntariness of a statement, the court must examine the totality of the circumstances. *Climer*, 400 S.W.3d at 568 (citing *Dickerson*, 530 U.S. at 434).

We begin our analysis with the presumption that the recorded interview not included in the record supports the trial court's ruling. *Oody*, 823 S.W.2d at 559; *Caudle*, 388 S.W.3d at 279. And because this court may consider evidence offered at trial when reviewing the trial court's suppression order, *Washington*, 2025 WL 2847585, at *3 (citing *Henning*, 975 S.W.2d at 299), we examine not only the suppression hearing testimony but also the trial proof, including the recorded interview played for the jury. Based on our review of the record, we conclude that the evidence does not preponderate against the trial court's factual findings.

Here, the trial court resolved the conflicting testimony in the State's favor. Specifically, the trial court rejected Defendant's testimony that an "FBI agent" had threatened to arrest or incarcerate Defendant's son in exchange for Defendant's confession to the methamphetamine and guns found at his residence and Defendant's assistance in providing incriminating information about the Aryan Brotherhood:

> Defendant's manner and demeanor before the Court was poor and Defendant was motivated to testify in a manner to minimize his criminal liability in this case. Defendant's statements of a threat were unreasonable in light of how readily he confessed to vast knowledge of his own criminality and detailed knowledge of the narcotics trafficking trade locally during his recorded interview. Defendant's claim of a threat was contradicted by [Sergeant] Bryan Martin and Monroe County Sheriff's Department Detective Dalton Rinehart. In sum, [Sergeant] Martin and Detective Rinehart were more credible witnesses than Defendant, and the testimony of [Sergeant] Martin and Detective Rinehart was consistent with the recorded interview with Defendant. Defendant was not able to positively identify the FBI agent who made this supposed threat in Court despite seeing both [Sergeant] Martin and Detective Rinehart within the courtroom during the [suppression] hearing. Defendant asserted that he was willing to admit to the homicide of "Jimmy

Hoffa" if it meant sparing his son from arrest and that such threat was the inducement to make his recorded confession.

The trial court accredited Sergeant Martin's testimony and found that it was consistent with the interview:

> [Sergeant] Martin possessed a high level of respectability as a twenty-two[-]year law enforcement veteran. [Sergeant] Martin exhibited a good appearance and demeanor before the Court. His testimony was inherently reasonable and corroborated by the recorded interview and the testimony of Detective Rinehart. [Sergeant] Martin, on the day of the seized evidence, was working with the FBI as part of a "joint terrorism task force." Specifically, [Sergeant] Martin was investigating outlaw motorcycle gangs and white supremacist groups. [Sergeant] Martin confirmed that the Aryan Brotherhood was a group of interest for him as an investigator. On the day in question, [Sergeant] Martin was in plain clothes but was wearing an FBI logoed bullet proof vest. [Sergeant] Martin asserted, and this Court finds, that there were no other conversations with Defendant in addition to the recorded interview admitted as evidence as Exhibit 1. [Sergeant] Martin asserted, and this Court finds, that there were no threats made to Defendant during the interview. [Sergeant] Martin did tell Defendant that someone was going to jail for the seized evidence. Rather than being a threat, however, such statement was merely an assertion of fact given the large quantity of suspected narcotics law enforcement seized on the day in question at Defendant's property. [Sergeant] Martin confirmed that Defendant claimed the suspected drugs and that Defendant did not want his disabled son to go to jail. Again, however such assertion was pressure Defendant applied to himself as a protective father and was unconnected to anything government agents did or said at the scene.

The trial court accredited Detective Rinehart's testimony and found that it had corroborated Sergeant Martin's testimony and was, likewise, consistent with the interview. This court is bound by the trial court's factual findings because the evidence does not preponderate against them.

Sergeant Martin denied that there was any part of the interview not documented on the recording or that he conducted a "pre-interview" of Defendant before the recording began. He specifically denied threatening to arrest or imprison Defendant's son in exchange for Defendant's culpability for the methamphetamine and guns and Defendant's assistance in providing incriminating information about the Aryan Brotherhood. Sergeant Martin's testimony was corroborated by Detective Rinehart who testified that Defendant

- 24 -

was never threatened or coerced into making a confession lest his son take the fall for the drugs and the guns.

Sergeant Martin and Detective Rinehart testified consistently with the recording of the interview played at trial. From nearly the beginning of the interview, Defendant was eager to talk and resolve the matter. Without prompting from either officer, Defendant freely admitted that the drugs and the guns were his. He admitted that he instructed his son to hide the guns, that he hid the methamphetamine "in the woods" about an hour before the entry team arrived, and that he constantly moved it around under "stumps" or "leaves." He never denied culpability and to the contrary, provided details about his drug dealing enterprise, including who supplied the drugs, how he communicated with his supplier, how often he received shipments, how much he received in a shipment, how they were delivered and by whom, to whom he sold the drugs, how he measured the amount for resale, how much he sold on average, and how his business had changed.

Under the totality of the circumstances, Defendant's statement was voluntary and was not compelled in violation of the state or federal constitution. The trial court did not err in denying Defendant's motion to suppress his statement. He is not entitled to relief.

### III.  Sufficiency of the Evidence

Defendant contends that the evidence is insufficient to support the jury's verdict that he actually or constructively possessed the methamphetamine and guns found during the search of his property. The State argues that a reasonable jury could conclude that Defendant constructively possessed the methamphetamine and the guns. In reply, Defendant insists that he was merely present where the contraband was found thereby undermining the sufficiency of his convictions. We disagree.

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. "A guilty verdict 'removes the presumption of innocence and replaces it with a presumption of guilt.'" *State v. Reynolds*, 635 S.W.3d 893, 914 (Tenn. 2021) (quoting *State v. Gentry*, 538 S.W.3d 413, 420 (Tenn. 2017)); *State v. Allison*, 618 S.W.3d 24, 33 (Tenn. 2021). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *Allison*, 618 S.W.3d at 33; *State v. Jones*, 589 S.W.3d 747, 760 (Tenn. 2019). The relevant question the reviewing court must answer is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Allison*, 618 S.W.3d at 33-34 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also* Tenn. R. App. P. 13(e).

On appeal, "all reasonable and legitimate inferences from the evidence must be drawn in favor of the prosecution and all countervailing evidence discarded." *State v. Weems*, 619 S.W.3d 208, 221 (Tenn. 2021); *State v. Rimmel*, 710 S.W.3d 640, 645 (Tenn. 2025). This court is precluded from re-weighing the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017). Questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *Rimmel*, 710 S.W.3d at 645; *Allison*, 618 S.W.3d at 34; *Jones*, 589 S.W.3d at 760. "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

At issue here is whether Defendant knowingly possessed methamphetamine with intent to deliver or sell and whether he knowingly possessed a firearm having previously been convicted of a felony crime of violence. *See* T.C.A. §§ 39-17-434(a)(4); 39-17-1307(b)(1)(A). Defendant had a prior conviction for burglary which is among the crimes identified as a "crime of violence." *Id.* § 39-17-1301(3).

At dispute is whether Defendant possessed the drugs and guns sufficient to support his convictions. Possession may be actual or constructive. *See State v. Robinson*, 400 S.W.3d 529, 534 (Tenn. 2013) (citing *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001)). If possession is deemed to be constructive, there must be proof that the accused had "the power and intention at a given time to exercise dominion and control over . . . [the drugs] either directly or through others." *Shaw*, 37 S.W.3d at 903 (quoting *State v. Patterson*, 966 S.W.2d 435, 445 (Tenn. Crim. App. 1997)). Although an individual's "mere presence" in an area where drugs are found without more is insufficient to find constructive possession, *State v. Bigsby*, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000), "a person in possession of the premises where controlled substances are found may also be presumed to possess the controlled substances themselves." *State v. Ross*, 49 S.W.3d 833, 846 (Tenn. 2001). Ultimately, constructive possession depends on the totality of the circumstances and may be proven by circumstantial evidence. *Robinson*, 400 S.W.3d at 534; *Dorantes*, 331 S.W.3d at 379.

Defendant argues that absent his improperly admitted statement claiming control and ownership of the methamphetamine and the firearms, there was no proof of possession necessary to support his convictions. It is well-established that a conviction based on a confession cannot stand unless the confession is corroborated by independent evidence. *State v. Bishop*, 431 S.W.3d 22, 61 (Tenn. 2014) (adopting the modified trustworthiness standard to assess whether an extrajudicial confession has been corroborated); *State v. Earley*, 719 S.W.3d 228, 248 (Tenn. Crim. App. 2025) (stating that "the corroboration

requirement is a low threshold"). However, the truth or falsity of a confession becomes a matter for the jury once the trial court has determined that a confession was voluntary and minimally corroborated. *State v. Housler*, 193 S.W.3d 476, 489 (Tenn. 2006).

Because we have already determined that the trial court did not err in denying Defendant's suppression motion, we defer to the jury's finding on the weight and credibility of the confession and view the confession like the other proof in this case—in the light most favorable to the State. *Bishop*, 431 S.W.3d at 56 (emphasizing that the voluntariness of a confession affects is admissibility while the lack of corroboration of a confession affects the sufficiency of the evidence to convict). Here, the jury listened to the interview and observed Defendant as he testified. By their verdict, the jury accredited Defendant's confession and discredited Defendant's testimony by convicting him as charged.

Viewing the proof in the light most favorable to the State and based on the totality of the circumstances, a rational trier of fact could conclude that Defendant constructively possessed the methamphetamine and the firearms sufficient to support his convictions. The two loaded firearms and the plastic bag containing 302.70 grams of methamphetamine were found on property where Defendant had lived for sixteen years. When law enforcement arrived to execute the search warrant, Defendant's son was seen running with a gun out of the same barn from which Defendant and his children were later escorted by officers. Defendant admitted in the interview that he had instructed his son to hide the gun as soon as law enforcement arrived, thereby demonstrating his intent to exercise control over the gun, through his son, and thus satisfying the requirement of dominion and control.

Additionally, the bag of methamphetamine was hidden in a blue barrel in the woods near where Defendant's son surrendered and abandoned the gun. Defendant admitted in the interview that the methamphetamine belonged to him, that he had hidden it "in the woods" only an hour before the officers arrived, that he had periodically moved it to prevent its discovery, and that it would be the only drugs the officers would find in the search of his property. Although Defendant was not in physical possession of the methamphetamine or the firearms, the proof satisfied the legal standard for constructive possession sufficient to support his convictions on both counts. Defendant is not entitled to relief.

## IV. Revocation of Bond

Defendant claims the trial court's decision to revoke his bond during trial for him to receive life-saving insulin amounted to "pre-adjudication punishment." For relief, he argues that the charges should be dismissed as jeopardy had already attached at the time of the bond revocation. The State argues that this court lacks jurisdiction to consider this

issue because it is not an appealable issue under Rule 3 of the Tennessee Rules of Appellate Procedure ("Rule 3"). The State further argues that should this court consider the issue on the merits, the Defendant is not entitled to relief because among other things, the record supports the trial court's decision to revoke Defendant's bond under Tennessee Code Annotated section 40-11-141(b) and Defendant's due process had not been violated. In his reply brief, Defendant claims the jurisdiction claim is "misguided" but advances no argument. Instead, he maintains that he was placed at a disadvantage by the "spur of the moment" incarceration.

We must first determine whether we have jurisdiction to consider the merits of this issue. Tenn. R. App. P. 13(b). Tennessee Rule of Appellate Procedure 3(b) governs appeals as of right by defendants in criminal actions and specifies the types of orders that are appealable. Rule 3 does not provide for appeals as of right from orders imposing or revoking bond conditions, including temporary revocations of bond. Tenn. R. App. P. 3(b) (identifying judgments of conviction, orders denying or revoking probation, post-conviction orders among the types of judgments and orders governed by Rule 3). Caselaw confirms that bond-related decisions, such as the imposition of conditions or revocation of bond, are not appealable under Rule 3. *State v. Moore*, 262 S.W.3d 767, 771 (Tenn. Crim. App. 2008); *State v. Branham*, No. E2013-00638-CCA-R3-CD, 2014 WL 869552, *6 (Tenn. Crim. App. Mar. 4, 2014).

Instead, revocation or release decisions are governed by Tennessee Code Annotated section 40-11-144:

> The actions by a trial court from which an appeal lies to the . . . court of criminal appeals in granting, denying, setting or altering conditions of the defendant's release shall be reviewable in the manner provided in the Tennessee Rules of Appellate Procedure.

T.C.A. § 40-11-144(a). Under the Tennessee Rules of Appellate Procedure, Rule 8(a) ("Rule 8") is designed to address unsatisfactory release orders including bond revocations. The purpose of Rule 8 "is to ensure the expeditious review of release orders." Tenn. R. App. P. 8(a), Advisory Comm'n Cmts. Our supreme court has held that Rule 8 is the "*only effective* remedy" for addressing an unsatisfactory release order[.] *State v. Melson*, 638 S.W.2d 342, 358 (Tenn. 1982).

The origin of this issue is atypical, but this court is constrained by the manner in which Defendant has identified and presented the issue on appeal. The proper method of review of a trial court's revocation order is by filing a Rule 8 motion for review in this court, and not as an appeal as of right under Rule 3. Thus, because the revocation of bond

- 28 -

is not an appealable order under Rule 3, this court lacks jurisdiction to address the merits of this issue. The issue is dismissed.

## V. Sentencing

Finally, Defendant contends the trial court erred in ordering his sentences to be served consecutively because a fifty-two-year sentence is not the least severe measure to achieve the purpose of sentencing and is not reasonably related to the severity of the offense. The State responds that the evidence supports the trial court's sentencing decision. We agree with the State.

This court reviews a trial court's decision on consecutive sentencing under an abuse of discretion standard with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). With respect to consecutive sentencing, the presumption of reasonableness applies where a trial court "properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review[.]" *Pollard*, 432 S.W.3d at 862. This means that the reviewing court will give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *Id.* at 861.

As relevant to this case, the trial court may order sentences to run consecutively if it finds by a preponderance of the evidence that a defendant is "an offender whose record of criminal activity is extensive[.]" T.C.A. § 40-35-115(b)(2). Another criterion for consecutive alignment is where a defendant is "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]" *Id.* § 40-35-115(b)(4). Additionally, when imposing consecutive sentences, the trial court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* §§ 40-35-102(1), -103(2), -103(4); *State v. Imfield*, 70 S.W.3d 698, 708 (Tenn. 2002).

First, the trial court imposed a within-range sentence for each conviction. Specifically, the court sentenced Defendant, a Range II multiple offender, to forty years on the methamphetamine conviction, a Class A felony, and twelve years on the firearm conviction, a Class B felony. *See* T.C.A. §§ 40-35-112(b)(1) (providing that Range II sentence for Class A felony is twenty-five to forty years); (b)(2) (providing that Range II sentence for a Class B felony is twelve to twenty years).

Here, the trial court stated its reasons for consecutive sentencing:

You're talking about a guy who's been to prison, who has at minimum past connection with white supremacists, and who has connections to Mexican Guzman drug cartel, who knows details, knows the parlance, the colloquial phrases of how this stuff works. He's just neck deep in crime. I do find that when you look at 40-35-115 subpart (b) (2), I find that he is an offender whose record of criminality is extensive. Conspiracy, cocaine for resale, previous on community corrections, meth for resale, marijuana for resale, driving offenses, auto burglary, now he has the weapon charge. And I think when you look at that it is an adult life of crime. It's just a legion or mind-numbing amount of criminality.

I have taken into consideration the HMVO status is no longer a crime but it was when you were convicted of it. So, we've got driving, we've got property, we've got extensive drug trafficking criminal history. This is a very aggravated, excessive methamphetamine for resale case, you've got someone with previous white supremacist connections. It all just adds up to by, well in excess of a preponderance of the evidence that his criminal history is absolutely extensive, and I do apply that (b)(2).

These findings are supported by the record and are in harmony with the purposes and principles of sentencing. Defendant's criminal history spans over three decades, covers three counties, and includes multiple convictions for selling a variety of illegal drugs of increasing weight. His record began in 1989 in Blount County with convictions for conspiracy to sell cocaine, expanded to convictions for selling marijuana, continued to include traffic and property-related convictions, and culminated with convictions for selling methamphetamine in Loudon County and the instant convictions in Monroe County. Indeed, despite telling the jury under oath that he had no knowledge or skill in selling methamphetamine, Defendant was on community corrections for the Loudon County conviction when he committed the underlying offenses in Monroe County.

Defendant argues that his sentence is "one commensurate with a homicide, violent rape, or kidnapping" and is inconsistent with the principles of sentencing. We disagree. The trial court did not abuse its discretion in finding that the aggregate sentence is reasonably related to the severity of the offenses and the least severe measure necessary to achieve the purpose of sentencing.

The record reflects that the trial court considered Defendant's extensive criminal history, lack of any verified employment, and the dangerous aspect of the weapons and drug cartel connections and found fifty-two years to be the least severe measure necessary

to achieve justice. The trial court further found that consecutive sentencing was necessary to protect the public from further criminal acts by Defendant:

> This Court finds he lied to the jury, he tried to make this a farcical proceeding, tried to pervert them and when this Court knows he was on community corrections for meth for resale . . . he needs to be restrained for as long as possible to protect the community and to achieve justice.

Defendant has failed to rebut the presumption that his sentence is reasonable. The trial court did not abuse its discretion in ordering consecutive sentences. Defendant is not entitled to relief.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

S/*Jill Bartee Ayers*
JILL BARTEE AYERS, JUDGE